## THE NATIONAL UNION *v.* BENNET.

LIFE INSURANCE; SUICIDE; EVIDENCE; INFERENCES.

The trial court properly directs a verdict for the plaintiff in an action on a certificate of life insurance, where the defense is that the insured committed suicide, although the defendant's testimony, which is of a circumstantial nature, warrants the inference that the insured swallowed an ounce of laudanum on the night previous to his being found dead in his bed, and shows that within two or three days he had attempted to purchase laudanum with suicidal intent, where there is no evidence whatever tending to show that such a quantity of that drug if swallowed at once or at intervals during the night would necessarily or probably produce death; it

being not permissible to allow the jury to infer one fact from circumstances in order that it may be taken as the foundation for the inference of another fact necessary to the defense and of which there is no other evidence direct or circumstantial; *following* Weaver v. Railroad Co., 3 App. D. C. 436, and Davis v. United States, 18 App. D. C. 468.

No. 1226.  Submitted October 23, 1902.  Decided November 11, 1902.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia, entered upon a verdict for the plaintiff, directed by the court in an action upon a certificate of membership in a mutual insurance company.                                    *Affirmed.*

The COURT in the opinion stated the case as follows :-

The National Union, an incorporated mutual insurance company, appeals from a judgment of the Supreme Court of the District, on a verdict for the plaintiff returned in obedience to the direction of the court.  The action was begun by Ella J. Bennet and Carrie M. Bennet, wife and mother, respectively, of Jeremiah H. H. Bennet, and the beneficiaries named in a certificate of membership held by him in said National Union under date of May 26, 1900.

The plaintiffs rested their case on proof of the policy, the compliance with all the conditions required therein of the member and the beneficiaries, and the death of Jeremiah H. H. Bennet on October 30, 1900.

The defense was founded on the following clause of the certificate, or policy:  " I further agree that no benefit whatever shall be paid upon my death should I commit suicide within two years after becoming a beneficial member, whether at the time of committing suicide I shall be either sane or insane."

The evidence on behalf of defendant showed that Jeremiah H. H. Bennet had been an employee of the Government printing office; that he came to the house of Mr. and Mrs. McGraw, 729 First street, N. W., on October 20 or 23, 1900, and secured a room and board; that on the morning of the

30th he was found dead in his bed.    Mr. McGraw, who was a " helper " at the printing office, testified that Bennet went to his work every day; that he was apparently well; that he drank intoxicating liquors " very near every evening;" that he came to seek board without his wife, and said that he had had a misunderstanding with her in regard to $50 that he wanted to pay certain debts, and which she refused to let him have, and that he had left her for that reason.    He further testified to the discovery of Bennet's death as follows:

" The first time I saw Mr. Bennet on the morning of October 30 was at 7 o'clock.    I went to call him to his breakfast. I went in the room to wake him, and he seemed to be very limber and in a perspiration, and the boys in the back room said I shouldn't; and for reasons I was not allowed to call him.    I left him alone, thinking he would get up during the day or between that and noon and go to work.    I pulled the covers across his feet, so they would be exposed, and perhaps he would get cold and wake up of his own accord.    On coming home at noon my wife told me he had not gotten up, and I should go up and call him again.    I found him in the same position I had left him in the morning, lying with his feet sticking out from under the covers.    I took him by the arm and found he was stiff.    I called my wife and told her he was dead.    I at once went for a doctor.    I was not able to find Dr. Chadwick.    Some one then called Dr. Sutor.

" The second time I went into the room and found Bennet dead, the body was lying across the bed.    It was not in the same position as when I first saw it.    I pulled it across the bed when I first went in in the morning.    No, sir; I did not buy any laudanum.    I do not know of anybody in the house who bought any laudanum or who ever used any laudanum."

On cross-examination he said: " My wife called my attention to a slop jar or bucket in the room.    It was at the head of the bed, where any one could reach it easily.    If a drunken man wanted to throw up in the night he could turn and reach it.    When I went up in the morning and found Bennet limp I did not wake him.    Thought he would be up

after awhile. Thought he had been on a drunk and was
sleeping it off. Think he came in in the night about 12
o'clock. When I pulled him around in the bed in the morn-
ing I noticed something peculiar about him, and yet thinking
he had come in late and might be sleepy and hard to wake I
let him alone. He gave no indication of waking. He was
very limber."

Mrs. McGraw testified to seeing the dead body of Bennet
about 12 o'clock, October 30th, when called by her husband.
She said that she found on the dresser a glass and a beer
bottle, and on the mantel a small memorandum-book, which
was open with a small tablet lying upon it; that Bennet's
room was on the second floor and had a window opening upon
the small back yard; that directly under the window she
found a small piece of white paper that had apparently been
rolled in the hand, and which had Bennet's name on it and
the word " paid;" that in the yard, straight out from his
room, she found a small druggist's vial with the label of a
Baltimore druggist showing the word " laudanum." Dr.
James R. Nevitt, the coroner of the District, testified that he
was called to the house and examined the room and its con-
tents and the body of deceased; that he saw an empty beer
glass on a table or bureau which had evidently been recently
used; that it contained beer and some other liquid which had
the odor of laudanum; that he saw the memorandum-book, as
described, on the mantel; that there was nothing peculiar
about the appearance of the bed; that he made a preliminary,
and a thorough examination of the body; that externally it
appeared not different from that of any body; that after his
examination of the remains he was not able to form a judg-
ment as to the cause of death; that a one-ounce laudanum
vial with a Baltimore label was shown him by Mrs. McGraw;
that no jury of inquest was summoned.

Felix A. Van Ruth, a pharmacist of Twentieth and K
streets, N. W., testified that he had been introduced to de-
ceased some time in October about two days before his death;
that deceased asked for laudanum and witness told him what
he needed was a Turkish bath and a little something to

strengthen the stomach; that this occurred in the forenoon and deceased returned twice in the afternoon, asking for laudanum each time, which was refused; that he returned on the next day (Monday) in a cab and asked for laudanum, and was told that he could not get it save upon a physician's prescription; that he had no idea a physician would prescribe it, but directed him to an office across the street; that he went out to the door and rang the bell, but was not admitted, and returned saying Dr. —— was not in; that he then insisted upon laudanum, saying: " I want to wind this thing up. I am tired of it and want to wind it up quick. Are you going to let me have it?" That witness replied, " No," when deceased turned in a threatening manner and said, " By ——, if I don't get it here I will go to Baltimore;" that his appearance was that of a man laboring under the effects of intoxicants; that in his talk on the first day, he said he had " had a fuss with the old lady," who wouldn't lend him some money that he wanted to borrow, and that " he was tired of life and wanted to wind matters up." On cross-examination he said that deceased " showed signs of having been on a spree "— " appeared to have been drinking three or four days."

John J. Harley, an agent of the Equitable Life Assurance Society, testified that he had been introduced to deceased at McGraw's during the latter part of October; that deceased asked what the premium would be on a $10,000 policy; that he asked if he should take a policy and kill himself would it be paid. Witness said it would, and that " he was not very persistent in talking further with the man;" but gave him an estimate of about $275 per year at his stated age of twenty-nine years. Mr. McGraw and his wife also testified substantially to the same effect as Harley in regard to this talk about insurance. One John C. Mackey, a compositor on the morning Times, testified to seeing deceased in Baltimore within a day or two of the day upon which he is said to have died.

The memorandum-book contained the following entries upon the open page:

McGraw . . . . . . . . . . . . . . . . . . $10 00
Commenced boarding October 23, 1900.

| Look through this book for information concerning myself. J. H. H. Bennet, 71 H St., N. W., Washington, D. C. | List of creditors. | |
|---|---|---|
| | O'Leary . . . . . . . . . . . . . . . . . . | $30 00 |
| | Bonini . . . . . . . . . . . . . . . . . . | 5 05 |
| | Dave Horn (about) . . . . . . . . . . | 7 00 |
| | Jimmie Shortall . . . . . . . . . . . . | 15 00 |
| | Dan Driscoll . . . . . . . . . . . . . . | 4 00 |
| | Levatan . . . . . . . . . . . . . . . . . | 8 00 |
| | Bicycle . . . . . . . . . . . . . . . . . | 12 00 |

Please send this book to Ella Bennet (who is my wife) at 71 H St. N. W., Washington, D. C., Oct. 28, 1900.

Upon this evidence the defendant rested. The plaintiff then offered testimony substantially as follows: William Schonberger testified that he was master of the morgue on October 31st, knew Bennet and saw his body after death; that a post-mortem examination was had by Dr. Glazebrook, the deputy coroner, who removed the stomach, inclosed it in a jar, and sent it by witness to Professor Hird, who was an inspector and chemist in the District health department. Professor Hird was then called and testified to his ten years' service as District chemist and his experience in such matters. He said that the stomach was contained in a jar and was nearly empty; that there were two or three tablespoonfuls of fluid then in the stomach and as many more were in the jar; that he looked for no particular poison but for any that might be present; that laudanum has no particular effect upon the structure of the stomach; that he could not tell how much laudanum would be necessary to kill a healthy man; that he found no traces of laudanum in this stomach; that he was not a physician and did not know, but supposed that in time laudanum would be absorbed into the system; that he could not say from the failure to discover any trace

of laudanum whether it had been taken into the stomach and absorbed into the system.

Mr. *Charles S. Kavanagh* and Mr. *William B. Reilly* for the appellant.

Mr. *Tracy L. Jeffords* and Mr. *George P. Chase* for the appellees.

Mr. Justice SHEPARD delivered the opinion of the Court:

It is conceded that the plaintiffs made out a case entitling them to demand the return of a verdict unless successfully met and overcome by the evidence in support of the defense of suicide. The burden was cast upon the defendant to show that the death of its deceased member was produced by his own intentional act. The question is, Was that evidence, which has been fully set forth above, sufficient to require the court to submit the issue to the jury?

It will have been observed that the defendant made no attempt to show, from an examination of the body, or the contents of the stomach of the deceased, that his death had probably been produced by laudanum or any other drug capable of producing death. The evidence developed the fact that physicians had been called immediately upon the discovery of the death, but none was called to give evidence. The coroner, who saw the body later in the day, made a thorough examination of it, and was unable to form a judgment as to the cause of death. On the other hand, the plaintiffs offered in evidence the fact, of which the defendant must have known, that the deputy coroner, who was a competent surgeon, had carefully removed the stomach of the deceased, inclosed it in a jar, and sent it to the District chemist for examination.

They then produced that officer as a witness, and proved by him, as we have seen, that he made a careful examination of the stomach and its contents, and found no trace of laudanum. Nor could he tell that laudanum had been taken into the stomach and absorbed into the system.

Now, assuming that the court and jury might take notice that laudanum, though a drug in frequent use, will, if taken in excessive quantities, produce death, still it cannot be contended with any show of reason that the quantity sufficient for the purpose is likewise a fact of common knowledge. If, then, the facts relating to the empty bottle found in the back yard, and the odor emanating from the glass found in the room, be conceded as sufficient to warrant the inference that the deceased had swallowed an ounce of laudanum during the night, there was no evidence whatever tending to show that that quantity, swallowed at once or at intervals during the night, would necessarily, or reasonably have produced the death. The only evidence on the subject was that of the District chemist, who said that he was unable to say how much laudanum would be necessary to kill a healthy man.

With no other evidence than that just referred to, and that tending to show attempts, within two or three days, to purchase laudanum with suicidal intent, the court was asked to submit the entire evidence to the jury and permit them, if they could be so persuaded, to infer, first, that the death of deceased had been produced by laudanum; and, second, that it had been swallowed for that purpose. In other words, the court was asked to permit one fact to be inferred from circumstances in evidence in order that it might be taken as the foundation for the inference of another fact necessary to the defense, and of which there was no other evidence direct or circumstantial. Clearly this was asking too much. As said by Mr. Justice Strong, in speaking for the Supreme Court of the United States: " We do not question that a jury may be allowed to presume the existence of a fact in some cases from the existence of other facts which have been proved. But the presumed fact must have an immediate connection with or relations to the established fact from which it is inferred. If it has not, it is regarded as too remote. The only presumptions of fact which the law recognizes are immediate inferences from facts proved. Remarking upon this

subject in *United States* v. *Ross,* 92 U. S. 281, 284, we said: 'Whenever circumstantial evidence is relied upon to prove a fact, the circumstances must be proved, and not themselves be presumed.' Referring to the rule laid down in Starkie on Evidence, page 80, we added: 'It is upon this principle that courts are daily called upon to exclude evidence as too remote for the consideration of the jury. The law requires an open and visible connection between the principal or evidentiary facts and the deductions from them, and does not permit a decision to be made upon remote inferences. Best on Ev. 95. A presumption which a jury may make is not a circumstance in proof, and it is not, therefore, a legitimate foundation for a presumption. There is no open and visible connection between the fact out of which the first presumption arises and the fact sought to be established by the dependent presumption. *Douglass* v. *Mitchell,* 35 Pa. St. 440.'" *Manning* v. *Insurance Co.,* 100 U. S. 693, 697. See, also, *Weaver* v. *B. & O. RR. Co.,* 3 App. D. C. 436, 454; *Davis* v. *United States,* 18 App. D. C. 468, 496.

In the light of these principles, it is clear that there was no error in the action of the court, and the judgment will be affirmed, with costs. It is so ordered.                   *Affirmed.*